If you're ready, good morning to all of you. My name is Dale Gallipo. I'm one of the attorneys representing the appellants. I am hopeful to reserve five minutes and I'm going to try to take seven of the first ten and leave three minutes to Mr. Arias. I'd like to focus my argument if I can on the second prong of qualified immunity. And before doing that, I'd like to focus on the facts of the case, including the disputed facts, because I believe it's clear that in order to decide whether the law was clearly established, we have to assume all plaintiff's facts and all disputed facts in favor of the plaintiff. We know that a homeless person was sleeping in the bushes or hedges. We know he had recyclables and a stick or pole, and we know that the officer gave numerous commands for him to come out of the hedges, which he eventually complied with. Yeah, so I'm going to obviously let you continue, but I want to see if you agree with me that other undisputed facts that the officer knew at the time he confronted your client was that he had contacted but not arrested him in 2020 after he was reportedly brandishing a knife, that in 2020 his contact with the officer was when he was arrested for a robbery in Santa Ana, during which he had knocked a street vendor victim unconscious, and that at some unknown time thereafter, but before this incident, he arrested your client on a felony warrant for assault with a deadly weapon and possession of meth. I think that is the officer's testimony, Judge Bennett, that she had that information, and I don't believe that is materially disputed. Thank you. You're very welcome. So then Mr. Garcia takes one foot out of the hedges after being commanded to do so, and he's tased. During the tasing cycle, he's shot twice. They know he has a stick because at some point they yell out he has a stick. Importantly, from the appellant's perspective, the officer never gives him a command to drop the stick, to stop, to get down on the ground, and shoots him without giving any verbal warning. The first shot, we believe, is as he's starting to turn away from being tased. The second shot was aimed at his back, although it hit his left side. She thought it hit his back in her deposition testimony, and he's about 10 feet away from the officer moving away. 10 feet away from Frias? From Silva, the shooter, Judge Bennett, and the distance on Frias is probably about 10 feet as well, although Frias, as you know, never even pulled out his weapon. He simply pushed him to the ground. So I thought it was undisputed that when your client was holding the stick five feet or so above his head, he was standing about two to three feet from Silva when she fired the first shot. We believe that is disputed, Your Honor. We think a fair viewing of the video has it more about five feet or more, but I agree that's subject to different interpretation. But we can look at the video and make a judgment based on what we believe the video shows in an undisputed way if we find that. I mean, the fact that somebody says the video isn't accurate doesn't make it a disputed fact under our circuit's law, right? Correct, but under NAHOD, videos such as this may be subject to more than one reasonable interpretation, and for the purposes of this analysis, you have to assume any reasonable interpretation in favor of the plaintiff. If I may just continue with a few of the facts, and then I wanted to talk about the cases very quickly because I know I don't have much time. The district court, in analyzing the cross motions for summary judgment, found that there were multiple material factual disputes. Whether the decedent posed an immediate threat, whether he was using the stick as a weapon, or whether it was a deadly weapon at all, whether he was advancing, whether he was lunging, whether the stick was moving for him to get out of the hedges and as a result of being tased, whether he was resisting, whether he was evading, and if you assume all those facts in our favor, which you have to for purposes of the second prong, you have to assume he was not an immediate threat, certainly not an immediate threat of death or serious bodily injury. He was not evading, he was not resisting, he was not advancing, he was not lunging, he gave no verbal threat and had committed no serious crime. I'm sorry. You are basically contradicting in part what the video shows. The video shows that he was not responding to the commands of the officer and that in that respect, he was either evading or impeding the officers as they tried to get him to come out. So the fact that you want to characterize that as not evading doesn't make it so and doesn't necessarily mean that it's a material fact that's in dispute. I mean, for example, with the stick, the video shows that. I think that's a fair comment, Judge Tallman. That's fair comment because there was a delay obviously in him getting onto the hedges and the officer herself kind of dictated the distance there by reaching in and trying to grab him at one point. The point that I'm trying to make was because he wasn't coming out. I mean, I get it. I certainly understand. I'm just saying a delay in coming out of some bushes does not justify shooting and killing someone. What did the toxicology report show? That's not part of the record in this case, Judge Tallman. So we have no idea what the results of the autopsy were? Because this case was investigated by the DOJ, the shooting of an unarmed man. They do unarmed people in the investigations and none of the materials were released as of the time of the MSJ briefing. I see. So you're basically saying they may exist, but you've never seen them? Correct. So if I can just finish, once you assume, which we believe you have to, for purposes of this analysis, he was not an immediate threat of death or serious bodily injury because that was a dispute the district court found. And I think it clearly is a dispute in this case that should be decided by a jury. But counsel, we're reviewing that DeNovo, right? That's absolutely correct. At this stage- And we, DeNovo, have to make our own judgment as to whether the way he's holding this stick above his head and the distance that we see from Silva, the type of threat, if any, that he was the type of threat that there was to Silva. I mean, we can look at it and I'm sorry, that the type of threat he was to Fries, and we can look at that and decide based on whatever distance we find he was from Fries when he was holding the stick, how much of a threat he posed to either of the officers, right? To some extent, what you really have to do is decide whether there's a material factual dispute about whether he posed an immediate threat of death. I think the distance in this case is misleading because Silva controlled the distance and asked him to come out of the hedges and was standing right there. This is not like other cases where someone was not complying with commands to drop a weapon and advancing towards the officer with the weapon. Counsel, do any of those cases that you cite involve facts where the officers knew about certain tendencies or facts about the defendant? In this case, the three prior encounters with the officer and the decedent. Do any of those cases involve something like that? To some extent, yes, and I'd like to cite the cases, if I may, that we believe put the officer on notice. I'd like to start with Hayes and George, and George importantly in 2013 said, this court has repeatedly held that officers are fairly on notice that shooting a suspect that does not pose an immediate threat of death or serious bodily injury would violate the Fourth Amendment, even when the suspect is armed. Then you have the case of the estate of Nehara Aguirre, which I know a little bit about because that's my case. In that case, as I'm sure the panel knows, the court found that this fell within the obvious, but even if it didn't, George and Morris, as of 2016, would have put an officer fairly on notice. The court in Aguirre said, Hayes and George make clear to a reasonable officer that a police officer may not use deadly force against a non-threatening individual, even if the individual is armed and even if the situation is volatile. I would suggest the facts of Nehara Aguirre were much worse than this case. He had to raise baseball bats, multiple commands to put him down, which he refused. He was advancing towards the officer. He had broken out windows, including a house window, and threatening people, including a woman and her child. I understand what you're saying, Judge Bennett. Someone could look at the video and say, well, he was close. He had a stick or pole. He didn't swing it, but who knows what could happen? Yes, that may be one view, but the question is whether there could be other reasonable views that he did not pose an immediate threat. And yes, you are able to review this de novo, Judge Bennett. I agree with that. But the district court judge, carefully reviewing it, found those were material, factual dispute. The other thing I'd like to mention is the case of SBV County of San Diego. That case, we believe, is very similar to this because someone suddenly grabbed a knife, which we believe is less threatening than a stick, within five feet of the officer. And they shot and killed that person. And the court held in 2017, although they granted qualified immunity because they felt the law was not clearly established at the time of the underlying incident, that case, as of 2017, made new law that that conduct supports a constitutional violation, which was expressed in the case of Penny. Also, Voss v. City of Newport Beach is another case, and many others. The point that I guess I'm trying to make is, yes, I agree you could look at the and say he was in close proximity. And you could also look at it and say he had this stick or pole. But we believe that there are more than one reasonable interpretation that could be made. And certainly a reasonable interpretation is that he did not pose an immediate threat of death. There were other reasonable options. He already was being tased. I think I should interrupt you because you're over your time. So I am willing to. I'll stop. I'll stop right here, Judge. Thank you for the interruption. Oh, I think you're muted. If I may please the court. Thank you, Your Honors. On behalf of the plaintiffs, Wendy Galicia, and Mr. Galicia as well, I think one point that I would like to make in the court to consider, it will be one of the issues that we presented, whether it's appropriate to apply qualified immunity in a situation when there is a legitimate issue, that it's going to be important to make a determination of a material fact. For example, and I'm looking at and hearing what my colleague is talking about, what Judge Bennett mentioned. It's important to note in this case that the Ninth Circuit Court has already established that when there is a legitimate issue that is still pending for determination, in this case, whether it is objectively reasonable for an officer in Officer Silva's position to consider Mr. Garcia as an immediate threat. Was that reasonable? That is going to be determined by what is it that's going on. And we can see the video. Was he an immediate threat? That is still pending. Even the district court recognized that that is legitimately at issue. In a jury, the court included in the decisions and the jury is better suited to make that determination. Why? Because we don't know. One person can determine, oh, he was just moving away from the officers. He's reacting to the taser. He's not actually attacking anyone. And other person may think otherwise. The fact that that is important to determine whether or not there was an immediate threat renders this case in the decision, unfortunately, inconsistent with the of Morales, of Longoria, and even Lopez, where the Ninth Circuit Court has been clear. If there is a legitimate issue, which is necessary for the determination of the immediate threat, qualifying immunity is not appropriate. And that's where we respect. You're not arguing, are you, that there would never be a situation where a court could not go to prong two and determine, even in the facts most favorable to the plaintiff, the law was not clearly established, that deadly force could not be used in these circumstances? No, your honor. Of course not. But in this case, even if we go to the prong, I will argue that Nihat and Lopez, by the way, as just mentioned, provide the basis for this case. In those cases, we have a call, no emergency, we have an officer responding, no emergency, no lights, no urgency, there is no serious crime involved, and there's no warning, and yet the person ends up being dead. So, for example, in Lopez, which was recently cited in the decision. The initial call was that he was armed with a knife, and he was walking around in front of the RV park, talking to himself, or wielding the knife. Isn't that what they're doing? Yes, your honor. Just like in Nihat, the report was a person seen in public waving a knife. That was the report. But no emergency, and there was no warning, and it was also this video where the officer in Nihat said, well, I thought it was an immediate threat. I thought he was coming towards me, just like officer Silva. It turns out the video shows he's moving. Is he going to attack? Is he just moving? That is for the jury to decide. And that's why Nihat, just as Lopez, which was recently cited in the decision on June, opinion by Judge Franklin, by the way, is the fact that whether or not a kid, a boy who was being told on the street, hey, and he had a BB gun, and he just moves, your honor. He just moves. The officer shoots at him, and then are we going to just simply conclude that it's reasonable automatically for an officer to react for that person being called, and that movement sufficient to kill the person. The decision of Lopez and the decision of Nihat support the finding that officer Silva was on notice. Shooting this person under these conditions was unreasonable, and we'll submit on that respectfully. Thank you. Hear from the other side. Yes, thank you, your honor, and may it please the court, Bruce Prade on behalf of the appellees, the defendant, officer Silva in this case. Judge Bennett certainly pointed out the remarkable distinction between this case and the other cases cited by the appellants, and that is that officer Silva had substantial prior knowledge of this individual given her prior arrest for him for a robbery in which he coincidentally knocked the victim unconscious, very similar to the threat that she was facing when he advanced on her with the five-foot pole, and the court can see it can't be disputed, and we even provided the court with the screenshot in our brief, both the district court and yourselves, where you cannot misinterpret the fact that the deceit in this case has got his entire weight on his front foot as he's raising that pole over his head, a five-foot pole, two to three feet from officer Silva, who has retreated into that hedge. She can't go any further. He is not just holding a pole vertically. There's no way to misinterpret that as a threat, and even if it's a mistaken threat, the Supreme Court in Sheehan has said officers need not wait until they suffer serious injury or death, even if she's mistaken. There's no way to misinterpret that, and the point really on appeal is not whether he was a reasonable threat. The district court, albeit reluctantly, said, I suppose a jury could somehow interpret this as unreasonable, but that's not the prong we're dealing with. We're dealing with whether or not this was clearly established beyond debate so that all but the most incompetent officers would realize that that split-second decision that she made was going to violate a clearly established constitutional right. It sounds like you watch this video and you see that this is a threat, but if we watch this video and think a jury might find that this was a threat, but a jury might find that this is just someone picking up recycling with a pole who was woken up and startled, wouldn't we have to say that if the jury found the latter, it was clearly established that it was unconstitutional to kill him? Clearly established under what circumstances? The specificity in the Fourth Amendment under Escondido versus Emmons has to be specific, especially in Fourth Amendment, where it's very difficult for officers to make these quick decisions and interpret the law. We have to look at a case that's at other than a high level of generality. Correct. And in your view, do any of the cases that are cited by your friends involve a circumstance where, among other things, the officer knew that very recently the individual had been accused of a robbery where they had actually knocked the person involved unconscious? No, there's not been a case cited, nor is there a case that I'm aware of that exists even remotely close to that. Do you think that given the Supreme Court's guidance to our court, that we can look at a case where the officer didn't have something akin to this knowing that this is a person who in a robbery had actually knocked someone unconscious? And these other two things, can we ignore those in deciding whether there's a case at a high level of generality or the required specificity? Oh, absolutely not. You can't ignore those facts. Those are the facts of this case that distinguish it from the cases cited by the appellants. In fact, most of those cases, Hayes... Can I ask you, if he came out of the bushes with a pencil, would it matter that he had these past crimes? I mean, would that mean because there's no other past crime, they could kill him? Well, certainly those are not the facts. And ironically, this court in Gregory v. Maui said that even a pen, when wielded in a threatening manner, can constitute a deadly threat. But this is at least a five-foot stick. This is. For a pole, right? This is not a pencil. This is not a pencil. And the manner that he came out was not somebody who is just holding a pole by their side. He's clearly raised it over his head. The officer is retreating. And, you know, to Mr. Gallipo's comment that he was shot as he was turning in the back, we provided the court SCR 15 with the autopsy, which shows that both shots fired within one second, excuse me, struck him to the front of the chest. And both shots were fired when he was two to three feet from Officer Silva. So to Judge Tallman's question, it is not in the record, but to answer your question, the toxicology result did show he was under the influence of methamphetamine as well, just to answer your question. So whether there's a disputed fact, which we submit there really isn't, as this court has decided in Voss, that's not the end of the inquiry. The inquiry is whether there is a clearly established law that this officer would have known beyond a debate she was violating. Was there testimony from the officers that they thought he was on drugs? Oh, absolutely. Yes. The officer did testify because she knew she had just arrested him a couple of months prior for possession of methamphetamine. When he was acting in the way that he was, she suspected he may be under the influence of methamphetamine. Where is the testimony that his behavior seemed like he was on meth? I didn't remember that. Maybe it exists, but I don't remember that. And I'm sorry, Your Honor, I'd have to go through the entire record to find that in her deposition. I just know that from familiarity with the case. I'm not sure that's particularly material fact, whether he was under the influence of meth or not. He certainly was. Well, right. I mean, you brought up the toxicology report. I understand it was asked about, but they didn't know the toxicology. And I don't remember there being testimony that suggested the toxicology. Well, they did suspect he may be under the influence, but they certainly, you're right, they did not know the toxicology. But in the incident you were talking about, as I understand it, the felony warrant was for both assault with a deadly weapon and meth possession that he was arrested for. And there's no dispute the officer knew that when she saw him come out with the pulp. You are correct, Your Honor. And the other cases cited, almost all of them involved people who were reportedly mentally ill, as opposed to, in this case, as the court has pointed out, someone who the day before was brandishing a knife, and in this case, assaulted the officer. So there's, and George versus Morris, it was an elderly man in a walker who had a gun, never pointed it. I agree. The law is clear that you can't shoot somebody who is not reasonably perceived as an imminent threat. But the facts in this case are clear, the specific facts of this case, that that's not the situation. So we would submit that on the clearly established problem, which is the only issue really here, there is not a case even remotely on point that would have put Officer Silva on notice beyond debate, that her split second decision would violate some clearly established law, which has not in any phase of this case been cited. And you know, their remaining claims, their state claims are proceeding in state court, whether they believe her tactics were negligent or anything else. That's the case isn't over. The only issue being decided here is qualified immunity for Officer Silva. If we were to reverse the qualified immunity decision and the federal claim was reinstated, would the state claims need to come back to federal court? That would be, I guess, up to the district court, whether or not she elected to continue to exercise her supplemental jurisdiction. But they are now pending in the superior court. I think with a trial date in October of this year, I'm sorry, trial date of October 2025. Yes. Unless, unless there's anything else from the court, I think we'll submit and just ask that the court uphold the district court who interpreted the law better probably than the officers could have and found that the officer was entitled to qualified immunity. Thank you. Doesn't look like there are other questions. So let's give two minutes for rebuttal. Thank you, Erin. Yes, thank you. The fact that there were other state law claims pending, I think is immaterial to this discussion. And in response to Judge Freeland's comment, yes, I think they would be joined back in federal court. This really is an egregious shooting. I've probably handled hundreds of police officer involved shooting cases. This is one of the worst that I've seen. Asking a guy, and by the way, they had a description of a person with blonde hair the day before yielding a knife. He didn't match the description in any way. He didn't have blonde hair at all. So that's how ludicrous this is. And you're asking a person who's homeless to come out of the hedge and he comes out and you kill him. And because you're close to him and because he has a pole and mind you, yes, Judge Bennett is five feet, but he wasn't holding it with his hands above his head. He wasn't swinging it. There's no downward motion of it. You could see with the stick, did you not? She claims that, Judge Talman, but you don't see it in the video. Well, you see her reaction when she puts her hand up and backs away immediately. That's the only explanation I can have. Well, that is not. On the video, through different colored lenses, but the video shows what it shows. Well, here's the issue, Judge Talman. Respectfully, I have to disagree with you. I do agree with you that she tactically repositions and I do agree. Tactically repositioned in a defense posture as if she's being assaulted. Well, I agree that she tactically repositioned in a defense posture and had reason for potential concern, but that doesn't mean that she was being attacked or that this was a true immediate threat of death and why not? The question is whether or not a reasonably objective officer under the circumstances would have perceived his behavior at that point as a potential assault on her, is it not? Isn't that part of the analysis? The problem is potential assault is not enough. Otherwise, you kill anyone any time you see holding anything that you're close to. It has to be an immediate threat. If it's true that he had actually poked her with the stick, he's now assaulted a police officer with a deadly weapon under 245B of the California Penal Code. But he never did that. He never did it. Yes, he did. But that's the problem. If the jury... Her credibility, Judge, is an issue and a jury needs to decide that. You see no poking motion in the video. So if you want to consider the video and you see no poking motion, her credibility becomes questionable. And then one should ask, why didn't she give him a command to drop it? Why didn't she give him a warning she was going to shoot him? She knew he was under the hedge. I'm sorry? Because he was coming out of the hedge at her. No, but you don't see that in the video. You see him come out. The stick is vertical because they ask him to come out and he's being tased. So any reaction to that is reasonable with a reaction to being tased. I get what you're saying. But to say that he was attacking her with that stick, I think at a minimum is a triable issue of fact. I'm not necessarily disagreeing with you on that. The problem is that the video doesn't show everything. That's... Well, that could be. That could be, Judge. That's why we need a jury to sift it out. I'm not sure I'm arguing against your position, counsel. Okay. Thank you, Judge. I don't know if there's any other question, but I appreciate the time and appreciate everyone listening to the arguments today. Thank you all, counsel, for the helpful arguments. This case is submitted and we are adjourned for the day. Thank you. Thank you. This court for this session stands adjourned.
judges: TALLMAN, FRIEDLAND, BENNETT